```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                       NORTHERN DIVISION

 3

 4   VANESSA BARRETT, ET AL.                        PLAINTIFFS

 5   VERSUS                 CIVIL ACTION NO.  3:21-cv-00124-HTW-LGI

 6   CITY OF PELAHATCHIE, MISSISSIPPI, ET AL.        DEFENDANTS

 7

 8                     MOTIONS PROCEEDINGS
 9          BEFORE THE HONORABLE HENRY T. WINGATE,
             UNITED STATES DISTRICT COURT JUDGE,
10                    FEBRUARY 8, 2023,
                     JACKSON, MISSISSIPPI
11

12

13

14   APPEARANCES:

15   FOR THE PLAINTIFFS:    TAMEKIA R. GOLIDAY, ESQ.

16   FOR THE DEFENDANTS:    JASON E. DARE, ESQ.

17

18

19

20

21
     REPORTED BY:
22
         CAROLINE MORGAN, CCR #1957
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4188
25       E-mail:  Caroline_Morgan@mssd.uscourts.gov
```

1

**TABLE OF CONTENTS**

2   Style and appearances.....................................   1

3   Court Reporter's Certificate............................  55

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **IN OPEN COURT, FEBRUARY 8, 2023**

2

3              (An off-the-record discussion was held.)

4          THE COURT:  Do it right here.

5          MR. DARE:  This is Exhibit B to Defendant Acy's

6     affidavit.  It is located at 75-1B, that's docket entry

7     75-1, again, B.  This is a diagram showing the location of

8     vehicles, the location of Mr. Woods, and where everybody was

9     at the moment that shots started to be fired.  Now,

10    generally leading up to those shots being fired, law

11    enforcement had been at this house for two, three hours.

12         THE COURT:  I got the background.

13         MR. DARE:  Gotcha.

14         THE COURT:  I read everything, but I was just asking.

15    I don't recall any statement by any of the officers that

16    they shot the decedent while he was on the ground.

17         MR. DARE:  That is correct.

18         THE COURT:  So then are they saying that the -- by

19    their absence of a statement, are they saying that he was

20    not shot while on the ground?  Is that their position?

21         MR. DARE:  That is not going to be the position.  The

22    officers will maintain in this case that they continued

23    shooting until they knew that there was not a threat.  The

24    officers that were speaking -- that we are talking about,

25    are generally those officers right behind this gold SUV.

1       THE COURT:  Okay.  Now, one of them said that the

2   decedent threw the gun at him.

3       MR. DARE:  That is Number 2 on the Elmo, that is Zach

4   Acy, so Mr. Acy -- or excuse me -- Investigator Acy saw the

5   individual when he was running through the house, still had

6   the gun.  He was the one that initially fired the impact

7   round, the nonlethal impact round, when he saw the gun in an

8   attempt to stop Mr. Woods from running out of the house with

9   the gun in his hand.  And the complaint even says Mr. Woods

10   still had the gun in his hand and was running towards the

11   front door.

12       And when that wasn't effective, then the other

13   officers, 1 Whittington who was Number 1 on here, fired at

14   the front door.  Three is Elward fired at the front door.

15   Four is Chase Beemon who fired at the front door.  And then

16   five is Luke Stickman who fired at the front door.

17       Now, it is uncontested that Dedmon, Geoff Rauch, Ty

18   Burleson, Justin Evans, A.J. DiMartino, and Cody Grogan,

19   both the individuals who was on top of the MRAP, and all of

20   these individuals behind the MRAP, they were all firing at

21   the window from which Mr. Woods had just fired.

22       THE COURT:  No.  So they said they didn't see what

23   happened at the front door.

24       MR. DARE:  They did not even see him coming out.  They

25   did not fire at the ground.  They didn't -- they were firing

1    over here at the window believing that Mr. Woods was firing

2    out of this window, and that's where the pictures of the

3    bullet holes in the house appear is because these

4    individuals were firing over at the house believing that the

5    individual was still shooting from the house.

6        THE COURT:  Now, what about all of the dust that was

7    kicking up from all of these bullets that were fired around

8    the body of the deceased?

9        MR. DARE:  So, Your Honor -- and the other two

10    individuals that are on here, I would specifically like to

11    mention far south of all of this, you have George

12    Barrentine, who was behind this SUV.  You also have Chance

13    White, who was in this tree area.  Both of those individuals

14    can be seen, I think, from the very latest video that was

15    provided to the Court.  Barrentine shot once, and then White

16    shot five times, and said it was as soon as he came out,

17    fired in rapid succession.

18        So what the Court is seeing is bullet fragments that --

19    or shots that are being fired from behind this vehicle.

20    This is also from the affidavit of Zach Acy.  This is 75-1.

21    This is Page 7 of 8.  This was the gold SUV that was parked

22    right in front of the house.

23        THE COURT:  So then how many shots are you saying came

24    from that direction?

25        MR. DARE:  From this direction, where you have

1  individuals right back here (indicating) who were

2  essentially -- let me see if I can get this working -- these

3  deputies are, in essence, shooting through -- if the Court

4  notices this SUV, they are shooting through this SUV and to

5  the area on the ground over here to where Mr. Woods came out

6  of the house.  And so what you have is, you've got officers

7  behind the MRAP that are firing at this window.

8      You also have officers that are behind this vehicle who

9  hear the shots also being fired, are not able to know that

10  Mr. Woods came out of the house, know that he had a gun and

11  had actually fired from the house, and they are not certain

12  that Mr. Woods is down.

13      As you can see, you cannot determine that an individual

14  is down on the ground while looking through this vehicle.

15  Even the officer that is shown on the video that's on the

16  hood here cannot see what Mr. Woods was doing when he was on

17  the ground over here, because your line of sight is through

18  this vehicle.

19      And so because of the shots that were being fired both

20  from back here towards this window (indicating) and from the

21  deputies here (indicating) who do not have a clear sight of

22  Mr. Woods right there, they kept firing until they knew that

23  the -- there was no longer a threat.  There was not a --

24      THE COURT:  Okay.  Hold on.  Keithfer, I want you to

25  come up here and play the tape for me, please.  Come on up.

1          (An off-the-record discussion was held.)

2          MR. DARE:  Will this be 35, the initial video that was

3     produced?

4          THE COURT:  She says yes.

5          The coroner classified this as a homicide/murder.  Has

6     that ever been changed?

7          MR. DARE:  This was presented to a grand jury, and

8     there has been a no bill.  I believe any time that there is

9     a shooting, that is what a coroner is going to classify it

10    as so that it can be presented to a grand jury.  There has

11    been a no bill, so there are no criminal proceedings pending

12    in this matter.

13         THE COURT:  Okay.  So it was no bill?

14         MR. DARE:  That is correct.

15         THE COURT:  I have seen this video several times, and

16    there are many gunshots into the ground around the deceased.

17    So an argument that an officer was shooting at a window is

18    going to be hard to carry, because the ground shows all of

19    the activity around the decedent with gunfire.  Then there

20    is a prolonged period of time where this occurs.

21         Okay.  We're ready to go now.  He's going to come out

22    of the house in just a moment and fall forward.

23         MR. DARE:  So what the Court hears initially, there is

24    an initial three shots.  It is uncontested that those are

25    three shots from Pierre Woods from the window shooting out

1    at the officers by the MRAP.  There are even statements that

2    those shots hit the MRAP and/or hit around them.  So those

3    initial three shots are from Mr. Woods.

4        THE COURT:  All right.  Keithfer, go ahead and play it.

5            (Video playing in open court.)

6        THE COURT:  Stop it there.  This picks up with him

7    falling out of the front door, correct?

8        MR. DARE:  The initial 35, or at least the one that was

9    provided to me, and I thought was the one that the Court

10   had, actually was ten seconds earlier and showed -- or where

11   you heard the first three shots of him firing, that was the

12   one that was played in Chief Daughtry's deposition.  That

13   was the one that was played in the sheriff's deposition.

14       THE COURT:  Now, I have another video over there.  But

15   this one is the one that I want to ask about, because look

16   to the far left.  You see the police officer there with --

17   is that an AK-47 there?  15?

18       MR. DARE:  That is -- that is Adam Whittington

19   according to the model.  It is a -- I believe he has a

20   .223-caliber style rifle.

21       THE COURT:  All right.  And let's see how many times he

22   fires it.

23       Go ahead, Keithfer.

24            (Video playing in open court.)

25       MR. DARE:  I have also reviewed the video.  I don't

1    think you can tell from the video exactly who is shooting at

2    what juncture.

3         THE COURT:  Then play it back over, because at some

4    point, either on this one or the other one, you can see a

5    lot of soil jumping up.

6         MR. DARE:  You can.  And there is no contesting the

7    video, and there you do see soil jumping up.

8         Your Honor, I think what differentiates this case from

9    the two that were cited by the plaintiff, however, and I was

10   going to get into that in my argument.  So that the two

11   cases in which the plaintiff cites for clearly established

12   issue are very different from this matter.

13        I think it would be uncontested that the initial shots,

14   when he's running with a gun in his hand after having fired

15   three shots at law enforcement, those are absolutely

16   reasonable.  And the question --

17        THE COURT:  Okay.  I don't want to go back that far.  I

18   just want to look at this point as to where he falls out of

19   the house on the ground, and the shot -- and the shooting

20   continues.

21        MR. DARE:  Correct.

22        THE COURT:  That's what I want to look at right now.

23        MR. DARE:  And I'm getting to that.

24        THE COURT:  Well, let's go ahead and start on that,

25   because I've read all of the preliminary stuff.  I want to

1    get to the point where he falls out of the house, and there

2    he is on the ground.  And the officers off to the left over

3    here (indicating) continue shooting at him while he's on the

4    ground.

5        MR. DARE:  And correct.  And so the cases that the

6    plaintiff has cited, *Roque vs. Harvel* and *Mason vs.*

7    *Lafayette City-Parish Consolidated Government*, are both

8    completely different than this one.

9        THE COURT:  Okay.  Now, I am going to hear your legal

10   argument later, but I want to get the factual matters first.

11   You have some officers who say he came out of the house and

12   threw his gun at them.

13       MR. DARE:  One of them saw it.  Correct.

14       THE COURT:  I think two of them did.  One of them said

15   he was -- one said he was throwing it at him, and another

16   one said he saw it.  But this is a statement they say that

17   the decedent came out and threw the weapon.  Now, I don't

18   see that here.

19       MR. DARE:  I don't either.

20       THE COURT:  So what's to say about what they are

21   saying, their credibility?

22       MR. DARE:  The -- there was a weapon that was located

23   on the ground.  Hunter Elward was the individual who was

24   actually hit by the gun.  The officers at that time didn't

25   know what Mr. Woods was throwing.  They -- Elward had the

1  gun, I believe hit him on the right side of his head.  He

2  goes down as soon as he is hit, thinking that he has just

3  been shot.

4       THE COURT:  Now, I didn't see that in his statement.

5       MR. DARE:  It's not in his statement.  And this is --

6  if we go forward, it is -- it's in his statement that he was

7  actually hit by the gun.  And Acy sees him being hit by the

8  gun.  And then the deputy to the left of Elward, that is

9  Chase Beemon, in his statement, he sees out of the

10  peripheral Hunter Elward going down to the ground.  Those

11  are each in the statements of these deputies.

12       However, each of these officers -- and if the Court

13  notices from these pictures, Mr. Woods fell right in front

14  of this vehicle (indicating), this gray SUV.  And so the

15  line of sight from even the hood to the bottom, you can't

16  tell if he is laying on the ground.  You can't tell if he

17  still has a gun in his hand.  You can't tell if he is

18  reaching for a gun.  And you also have shots coming from all

19  around, so that you don't know if he is still shooting at

20  law enforcement.

21       And that's what differentiates and that's why -- when

22  I'm getting into the legal argument, that's what

23  differentiates this case from every other case that the

24  plaintiff has cited.  The officers weren't over top, clear

25  line of sight, there's an individual that cannot move.

1        It is looking through a vehicle, seeing the individual

2    come out, he starts going down.  But you've got shots coming

3    from -- from your right, from your left.  You don't know if

4    that individual is still a threat, and so there is no break

5    in the shooting whatsoever.  And for that seven seconds,

6    there was a continuous shooting, both at the window and

7    towards the ground over here (indicating) until the officers

8    knew that the threat had ceased at that point in time.

9        THE COURT:  Keithfer, play the rest of it.

10                (Video playing in open court.)

11        MR. DARE:  And if the Court would like, I can -- I also

12    have photographs from the other side of the vehicle that

13    shows these bullets actually going through the gold SUV from

14    both over on this side (indicating) and from the front, so

15    that it is clear that there is no clear line of sight to the

16    individual.  There is no officer standing over him knowing

17    that he is no longer a threat and --

18        THE COURT:  But I was looking over here at the vehicle

19    to the left.  You have somebody virtually on the hood still

20    shooting.

21        MR. DARE:  Correct.

22        THE COURT:  And he can look over the hood and see the

23    deceased there on the ground.

24        MR. DARE:  He -- so if I may, can I put this photograph

25    back up?

1          THE COURT:  Okay.

2          MR. DARE:  So this is on the ELMO, and these are going

3     to be two different photographs.  So that video was taken --

4     if you're looking from here (indicating) in the far back

5     over here and at a different angle.

6          THE COURT:  Now, I want to look at it in perspective to

7     the person who was standing right there at the hood.

8          MR. DARE:  Right here, correct.

9          THE COURT:  Yes.

10         MR. DARE:  And you have --

11         THE COURT:  He was leaning over the hood shooting.

12         MR. DARE:  You have Woods right here (indicating).  You

13    have this individual leaning right here, (indicating) and

14    there are -- and you're --

15         THE COURT:  Well, he's a little farther back than that.

16         MR. DARE:  There's --

17         THE COURT:  The one who was doing the shooting is a

18    little farther back.

19         Keithfer, play that again, so we can look at the

20    perspective.

21         MR. DARE:  And I'm not sure if we even need to play it,

22    because the -- you can see right here from the video.

23         THE COURT:  You can see where the shooter is, and he's

24    behind the car behind the hood.  And there's the body that's

25    laying off to the right.

1          Now, if he had a difficulty visualizing the decedent

2    there on the ground, then how was he shooting so close to

3    him?

4          MR. DARE:  Through the vehicle.

5          THE COURT:  Well, let's see.

6          Go ahead and run it, Keithfer.

7               (Video playing in open court.)

8          THE COURT:  Now, you see all of those bullets going

9    out?  He could see the decedent on the ground.

10         MR. DARE:  And the Court can also notice at the -- at

11   the beginning of that, you can see the vehicle.  There is

12   actually shots going through the vehicle, and then those

13   stop.

14         THE COURT:  I'm focusing on all of those shots that

15   came later.  Now, there is another one.  Let me see that

16   other one.  Just one second.  We're going to play this other

17   one.

18               (Video playing in open court.)

19         THE COURT:  Okay.  And for good measure, let's have the

20   last one, too.

21         Keithfer, we can't see much on that one.

22         MR. DARE:  And I think the news coverage may be a

23   blown-up version of that last one that we just saw.

24         THE COURT:  Okay.  That's the news coverage right

25   there, the third one.

1          (An off-the-record discussion was held.)

2      MR. DARE:  And, Your Honor, there is one point in the

3   video that actually shows from behind the deputies that

4   makes it clear which one -- at what point in time he got

5   hit, and he takes a step back and looks as though he is

6   looking down.  And I have been trying to --

7      THE COURT:  Where is that video?

8      MR. DARE:  On here, the one I just watched.  It was

9   after the initial one, and if the Court will notice what

10  happens on this video is you can hear the sounds of the

11  shots.  You don't see the sounds of the shots from the ones

12  all the way far south.  There is a portion that I have just

13  seen -- and I have been trying to get a copy of this from

14  plaintiffs' counsel -- but there is a portion on here that

15  is behind the deputies when they are shooting.  And it was,

16  oh, gosh, probably the outer area.  It's towards the

17  beginning.

18     THE COURT:  Let's see if we can find that.  I don't

19  recall that.

20          (Video playing in open court.)

21     THE COURT:  Stop us when you see it now.

22     MR. DARE:  And this part doesn't show the actual

23  shooting, and then it was the next one, the next angle

24  that's played on here.

25          (Video playing in open court.)

```
 1              THE COURT:  Have you passed it?

 2         MR. DARE:  No, Your Honor.

 3                   (Video playing in open court.)

 4         MR. DARE:  Here.  Yep.  And so this is showing each of

 5    the officers actually behind the SUV, and I believe it was

 6    the one in -- the officer in gray that appears to look up

 7    and touch his helmet.

 8         It was the other individual.  You see the officer

 9    coming back and begin touching his helmet there?  That's the

10    first time I've seen that portion of the video, which

11    confirms that at least Deputy Elward wasn't continuing to

12    shoot.

13         THE COURT:  So where are you saying that the guy in the

14    gray was shooting?

15         MR. DARE:  It was the other individual.  It wasn't the

16    guy in the gray that had come back and was hit with the gun.

17         THE COURT:  Okay.  So then he should know that the gun

18    is no longer in the guy's hand.

19         MR. DARE:  And he wasn't even shooting either

20    because --

21         THE COURT:  So who is shooting all of the automatics?

22         MR. DARE:  There are -- there appears to be -- and if

23    the Court doesn't mind me playing -- can I plug this one up

24    to put this one up on the ELMO?

25         Your Honor, I can supplement this if I need to.  This
```

1    is a photograph from the other side of the vehicle where you

2    can see the -- what appears to be three shots through the

3    hood, four shots here in the door, and then the one shot

4    here in the door (indicating).

5         THE COURT:  So now, when are you saying that these

6    shots occurred?

7         MR. DARE:  I believe these are the shots that the Court

8    is hearing afterwards, and those are the ones whereby you

9    see some puffs of dirt coming up.  I do not believe that

10   Mr. Woods was hit at all once he fell on the ground.  I

11   haven't seen -- and I still need to go through this full

12   autopsy report.  I haven't seen anything in there showing

13   that he was, in fact, hit in the upper torso.

14        The one that stood out to me was -- you've got A, that

15   he was shot in the front, and then you have one of those

16   coming out the back.  You've got the one that counsel was

17   referring to, and I was reading through that and got

18   pictures of that as well.

19        But it is superficial back here looking as though

20   you're falling down, and then the other ones are from the

21   side still in the front.  And there is no evidence that I

22   believe, and, again, I've got to look through this in its

23   entirety.  It appears to be 22 bullet wounds in the autopsy.

24        Now, those also appear to be entry-and-exit wounds.  So

25   that there are -- there would be 11 shots.  Again, I'm not

1  representing to the Court that that's what this document

2  says, because I haven't been able to look through it.  I

3  just got it this morning.

4      But if that's the case and there's no evidence in front

5  of the Court that he was ever hit while laying on the

6  ground, then the issue of, you know, whether the officers

7  can see -- and I would submit based on the other side of the

8  vehicle being that -- you know, their view was obstructed by

9  the vehicle.  There was no clear line of sight of Mr. Woods,

10  there was no actual knowledge that he was no longer a

11  threat, at least it didn't occur immediately.

12      THE COURT:  Okay.  Then how do you account for the

13  statements of the witnesses that were provided to the Court

14  this morning?

15      MR. DARE:  I saw the -- so I saw some affidavits that

16  were filed yesterday that are -- one of them says that here

17  is the video, and I think that the Court has already played

18  that video.  And then, you know, basically I --

19      THE COURT:  They say he came out with his hands up.

20      MR. DARE:  Now, each of those witnesses are testifying

21  that they were standing where each of these videos were

22  made.  The video -- again, if I'm wrong I'm certainly --

23  again, I got those last night, so I'm going off of memory.

24  I don't think anybody said that he didn't have a gun in his

25  hand when he came out with his hands up.  In fact, I don't

1    think any of those affidavits ever mention whether he had a

2    gun in his hand or not.  And it is uncontested based on the

3    complaint that he had a gun in his hand.

4         THE COURT:  When he came out?

5         MR. DARE:  When he came out.

6         THE COURT:  I didn't see a gun on any of the tapes, and

7    then you have two officers who say that he threw the gun at

8    them.

9         MR. DARE:  After he had been shot.

10        THE COURT:  No, before.  They said when he came out, he

11   threw the gun at them.

12        MR. DARE:  And that is the -- what the plaintiff is

13   saying that this affidavit says.  It absolutely does not or

14   the --

15        THE COURT:  Well, let's look at the affidavit then.

16   There are two affidavits that concern us here.  Let's look

17   at both of those.

18        MR. DARE:  This is 75-1, Exhibit A.  This is the

19   statement of Zach Acy.

20        THE COURT:  Who?

21        MR. DARE:  Zach Acy.

22        THE COURT:  Zach Acy.

23        MR. DARE:  This is the individual who was standing to

24   the left of Adam Whittington, and what he says is

25   Investigator Acy fired -- well, let me take a step back.

1    Investigator Acy was looking through the front door that had

2    been breached earlier.  It's the one that the robot had been

3    placed in.

4        Investigator Acy could half see -- could see the

5    suspect running through the house yelling, and then he

6    appeared in the living room with a black pistol in his hand

7    and started pointing the pistol at officers that were on the

8    car, yelling that he did not give an "F" anymore.

9        Investigator Acy fired one impact round at the suspect

10    due to being in fear for his life, but the suspect continued

11    to advance.  The suspect was then shot by other officers

12    that had lethal means due to him still running with a pistol

13    in his hand.  So just --

14        THE COURT:  Now, I didn't -- I didn't see him running

15    with a pistol in his hand.

16        MR. DARE:  And you can't see the pistol in his hands

17    from the video.  And there is no affidavit, there's no

18    testimony, there's nothing saying that he didn't have the

19    pistol in his hand.  And, in fact, the complaint even says

20    that he was running with the pistol in his hand.

21        THE COURT:  Well, let's go back to the ones I told you

22    I just got this morning.  Let me pull those back up.

23        MR. DARE:  The ones that I printed off are 96-2, the

24    affidavit of Cameron Boyd.  Mr. Boyd --

25        THE COURT:  Okay.  Which one -- you start with Cameron

1       Boyd.  Okay.

2               MR. DARE:  96-2.

3               THE COURT:  Okay.  I have that one here.

4               MR. DARE:  And he said he reviewed the video, and "It's

5       a true and accurate representation of the events I observed

6       leading up to, including, and after the shooting death of

7       Pierre Woods."  Indicating that if it is true and correct

8       from what he saw, that was his vantage point the way I read

9       that affidavit.  So Mr. Boyd is standing at or around the

10      area where the video is showing.

11              THE COURT:  Okay.  Let's look at Paragraph 4.  "I

12      observed Pierre Woods stumbling towards the front door of

13      the property in a disorientated state.  He did not appear to

14      be a threat to himself or anyone else as he approached the

15      front door.  His hands were down by his side, and he was

16      clearly disoriented."

17              MR. DARE:  Correct.

18              THE COURT:  "Before he could stumble across the

19      threshold of the front door, he was gunned down by members

20      of the Rankin County Sheriff's Department.  He immediately

21      fell to the ground and was not a threat to himself or anyone

22      else.  Despite the fact that he was lying face down on the

23      ground and was not a threat to anyone, members of the Rankin

24      County Sheriff's Department continued to shoot him."

25              Okay, then.  That's what he says.  The next one is

1    Gloriett Harvey.  It says the same thing.  It's identical to

2    the first one I just finished reading.

3        MR. DARE:  Actually, all three of them are literally

4    word-for-word identical.

5        THE COURT:  And that's from Felecia Stokes.

6        MR. DARE:  Correct.

7        THE COURT:  And it's the same.

8        MS. GOLIDAY:  And, Your Honor, just as a point of

9    correction, Ms. Harvey and Ms. Stokes say that his hands

10   were above his head, so there is a distinction there.  As a

11   matter of fact, Ms. Harvey was very adamant that during our

12   interview of her that his hands were above -- above his

13   head.

14       THE COURT:  Okay.  One second.  You mean in the ones I

15   got this morning?

16       MS. GOLIDAY:  Yes.

17       THE COURT:  Okay.  Let's see.

18       MR. DARE:  That is 163.

19       THE COURT:  I see it, yeah.  And it says, "As he

20   approached the front door, his hands were above his head.

21   He was clearly disoriented."

22       MR. DARE:  Your Honor, two points on these affidavits.

23   One, when the plaintiff has in their complaint -- and we're

24   here on a -- also on a 12(c) motion, as well as a Rule 56

25   motion -- but when the plaintiff has in the complaint that

1    he was running towards the front door with a pistol in his

2    hand, and these affidavits don't reference the pistol, that

3    almost exemplifies why qualified immunity is proper in this

4    case.

5         You've got these three witnesses or these three

6    individuals on the scene, you've got all these other

7    individuals on the scene that don't even realize the threat

8    that they were in, that they didn't even mention the gun

9    that was in this individual's hand.  They don't mention the

10   fact that he had for hours said, "I'm going to kill every

11   police officer out here.  I'm killing everybody out here."

12   And so by simply saying I didn't think he was a threat, the

13   police officers who were right in front saw the pistol in

14   his hand, and it's uncontested.

15        THE COURT:  But I'm really asking about what happened

16   after he allegedly threw the pistol.

17        MR. DARE:  Correct.

18        THE COURT:  So then what happens after that point?

19        MR. DARE:  At that point --

20        THE COURT:  Because there's nothing on the videos that

21   showed him throwing anything.

22        MR. DARE:  That is correct.

23        THE COURT:  So then what is supposed to have happened

24   after he threw the gun away?  No one ever alleged he had

25   more than one gun.  And so they said that he had a gun, a

1   pistol at times -- even when he was looking out of the

2   window and adjusting the shades that he had a pistol in his

3   hand.

4       They said that he shot outside the door.  So we got him

5   shooting, threatening.  He threatened one police officer,

6   particularly Windham I think it is, when he asked to speak

7   to him, and because Windham said that he knew him and he got

8   along well with him.  But the decedent said that if --

9   supposedly said that if Windham came that he was going to

10  shoot him.  He threatened the other officers.

11      So we have all of that.  But then he is -- or before he

12  is killed, he is going across the -- what appears to be the

13  living room, and then he goes to the door, and then he falls

14  out of the door, then he's shot.

15      Now, when he throws the gun at the officers, I don't

16  know.  But two officers saying he threw a gun at them, but I

17  didn't see that in the video.  But, nevertheless, we have

18  him falling out of the doorway because of all of the shots

19  that are fired.

20      So he falls out of there, the doorway.  He's on the

21  ground.  And then I can see in the first video at least two

22  officers who are shooting across the hood of the car, and

23  you can see the ground being disturbed, all the dust jumping

24  up.  So whether they were hitting him or not, they certainly

25  were hitting the ground around him, so then seemingly they

1    saw him.

2        So my question is:  Who was doing the shooting?  But I

3    notice that nobody in his statement says that he shot him

4    while he was on the ground.

5        MR. DARE:  Each of the officers that were behind the

6    gold SUV have said they continued firing until they knew

7    that there was not a threat.

8        THE COURT:  Well, when the sheriff says "cease fire" --

9        MR. DARE:  And the sheriff said, "I don't remember if I

10    was the first one to yell cease fire.  I know we all started

11    yelling it about the same time."  But, correct, when they

12    all started yelling cease fire.

13        Now, the sheriff -- and it's not specifically on this

14    diagram, so the sheriff, per his testimony, is back in this

15    area (indicating), said he was behind the tire.  And then so

16    as the shooting goes on and as these individuals are

17    shooting this way, the sheriff moves around and then

18    visualizes through here (indicating) that Mr. Woods was on

19    the ground and begins yelling "cease fire," all of which

20    happens in seven seconds.

21        And, Your Honor, I submit that based on -- based on all

22    of the case law, and we can get into all of the case law if

23    the Court would like.  But based on all the case law, the

24    actions here were absolutely reasonable simply because there

25    is no knowledge that Mr. Woods was no longer a threat.

1   There is no confirmation like you have in *Mason* and like you

2   have in *Roque*.

3       What you do have is a clear indication that deadly

4   force was warranted initially.  You don't have any stop in

5   the use of deadly force until there is knowledge that there

6   is no longer a threat.

7       THE COURT:  Well, that's my question.  I am -- I'm

8   satisfied that prior to the time that he falls out of the

9   house, the officers could believe they were in harm's way.

10  But after he's at the front door is when I wonder, because

11  the testimony at that point is conflicting.

12      But before that we have all kinds of statements and

13  purported evidence that show that he could be a danger.  For

14  instance, we started off -- I'll go through it.  We start

15  off that the police received a call to come out there,

16  because there is shooting at that particular household.

17      The police are told that shots were fired at members of

18  the household who were family members, and that he had

19  yelled threats that he was going to kill everybody, and the

20  end of the world was coming.

21      Members in his house then escaped the house, went out

22  through a window, at least one did, out through a window.  I

23  don't know how the others got out, but at least one went out

24  of a window that was a family member.

25      The police arrive, and they seek to negotiate with him.

1    Not only do the police seek to negotiate with him, but he

2    has three relatives out there, according to the police, who

3    tried to negotiate with him, two brothers and one other

4    person.  He won't come out.  And he's still yelling threats,

5    and he still has a gun.

6        And so at some point, he sticks his hand out of the

7    window or door and even fires the gun.  One police officer

8    says that the bullet landed close by him, and then he runs

9    around the house, inside the house, still issuing threats.

10   So the police chief has a bullhorn.  He gets on his

11   bullhorn, and he tells him to come out.  He doesn't do it.

12       According to the police chief, he gives the bullhorn to

13   some family members who then beg the decedent to come out,

14   and he still won't.  The times differ.  The police chief

15   says it's two hours.  Some of the other members say it's an

16   hour where all this negotiation is going on.

17       But, finally, the police chief decides he needs to

18   resort to other means.  So then they clear out the

19   neighborhood, the adjacent neighbors, and they've cleared

20   them out.  They move them.  And then the police officer

21   gives the order to try gas.  So they shoot some gas in the

22   premises, and that doesn't do any good.  So they shoot a

23   second canister up in the house, according to the police, or

24   they shoot two of them, and there's still a problem.

25       Now, they've already tried the robot.  They sent in a

1    robot.  They had to breach the front door, so they could put

2    the robot into the house.  So the robot then goes through

3    the house looking for the decedent, finally sees him, and

4    then some two gunshots rang out.  The police then are afraid

5    that the decedent has fired upon the robot.  They don't say

6    whether the robot stopped functioning.  They just simply say

7    that the robot found him, and then there was some shots.

8    And so the police then determine that he's not coming out,

9    and they can't talk him out.

10        They also say that he's talked to -- not talked to, but

11   his relatives have tried to talk to him.  Then Officer

12   Windham says that he told the police chief that he knew him,

13   had good relationships with him, and he didn't mind going

14   inside to talk to him.  The police chief says he didn't

15   think that was a good idea.

16        At any rate, Windham and the police chief announces --

17   announced that Windham might be coming in to talk to him.

18   According to them, the decedent says that if Windham comes

19   in there, he's going to kill him, and he issues some more

20   threats and some more curse words.  So then the police

21   decide that he is not coming out.

22        Unbeknownst to them, supposedly, the decedent has gone

23   into the kitchen and cut on the gas and cut it up to full

24   power.  And there's no flame on the stove.  They detected

25   that because they heard a sizzling, and when they went into

 1    the kitchen, they found that the gas was cut up.

 2         The officer who determined that, after he had gotten

 3    into the house after the shooting, yells out to everybody to

 4    get out of there.  And so they dash out of the house,

 5    because they think it's about to explode.  And then because

 6    he thinks it's about to explode, and they know the decedent

 7    is close to the house -- by this time he's already lying

 8    down -- two officers drag the decedent's body to safety.

 9    They say with danger to themselves, because as far as they

10    were concerned, the house could blow up at any minute.

11         So they drag him away from the house, so he can get

12    medical attention.  This medical attention was already being

13    afforded to him after the shooting when the EMTs arrived.

14    The police had handcuffed the decedent while he was lying

15    there on the ground to be sure that he could not pose a

16    further threat.  They didn't say at that point that he was

17    already dead.  They say they wanted to make sure that he

18    didn't pose a further threat, so they went ahead and

19    handcuffed him with some wire cuffs.  So there he was, all

20    tied up on the ground.

21         Now, when he had gone to the front door, at one point

22    he had looked out the window, but then when he went to the

23    front door and was eventually killed, we don't have a video

24    that clearly shows that.  Instead we see him falling out of

25    the doorway on the ground.  He doesn't appear to have a gun

 1    in his hand at that point.

 2         But as I said before, two officers said that he had

 3    thrown that gun at one of the officers.  So then he falls on

 4    the ground, and then there's this barrage of gunfire.  And

 5    then on the tape, we can see dust jumping up all around him,

 6    so we know bullets are hitting the ground.  We cannot

 7    distinctly tell if they hit him, but there's bullets all

 8    around.

 9         And then as I said, the police after that tried to

10    secure the house, and then they discover that the stove is

11    on.  He had said, according to the police, during the

12    confrontation and the standoff that he was going to blow up

13    the world.  And the fact that the stove was on, the gas was

14    on, would add more credence to the fact that he allegedly

15    said that.

16         But then we still have the question of what was his

17    condition when he came to the doorway.  These statements,

18    affidavits as submitted to me, two of them said that he had

19    his hands up, when he was not a threat to anybody, and that

20    the police just shot him anyway.  So that's the question

21    here.

22         Now, I'll hear from you all in just a moment.  But

23    there's another claim by plaintiffs, and this other claim is

24    bystander liability.  You've argued here that there's

25    bystander liability that at least five or six officers

1    should have yelled out to the others "cease fire" when the

2    decedent fell to the ground and was not moving and the shots

3    continued.

4        Two questions.  One -- and, Mr. Dare, let me ask her

5    these questions.  I'll come back to you.

6        One, when he fell to the ground, how do you know he had

7    been shot?  How do they -- how should they have known that

8    he had been shot?  Now, this is the first one.  We should

9    deal with that one.

10        MS. GOLIDAY:  The --

11        THE COURT:  The second one -- hold on, let me -- and

12    the second one is this.  I caught myself timing the episode

13    when he came to the door and fell and the shots -- barrage

14    of shots continued.  Mr. Dare is saying it was about seven

15    seconds.  That's about right.

16        Now, when would any other officer have had time to say

17    to the others "cease fire?"

18        MS. GOLIDAY:  Your Honor --

19        THE COURT:  Go to the podium, please.

20        MS. GOLIDAY:  Okay.

21        THE COURT:  Now tell me.

22        MS. GOLIDAY:  And that's -- that is an

23    excellent question, and I'll cite you to a case --

24        THE COURT:  Okay.  Before you get to it, Mr. Thompson,

25    are you in this case?

```
1          MR. THOMPSON:  I referred the case to Ms. Goliday, Your
2     Honor.
3          THE COURT:  Okay.
4          MR. THOMPSON:  But I did not enter an entry of
5     appearance in the case.
6          THE COURT:  Okay.  Good to see you.
7          (An off-the-record discussion was held.)
8          THE COURT:  Now, you can verify the time period.  How
9     much time elapsed --
10          MS. GOLIDAY:  Yes, sir.
11          THE COURT:  -- from the time that he came to the front
12     door and the first shot rang out until the last shot rang
13     out?
14          MS. GOLIDAY:  Yes, Your Honor.  And I calculated it at
15     approximately eight seconds.
16          THE COURT:  Okay.  And so during that eight seconds,
17     who had time to stop them from shooting?
18          MS. GOLIDAY:  Acy had time, because he knew he had
19     thrown the gun.  Acy's testimony is, "When he fell out the
20     house, he threw the gun.  I saw him throw the gun.  And then
21     we know Elward, the gun hit him."
22          Cease fire worked.  If there's -- there's no dispute
23     that cease fire worked.  These guys were just shooting and
24     shooting and shooting, and they didn't stop until the
25     sheriff yelled "cease fire."  The sheriff testified, "The
```

1    moment I said 'cease fire,' they stopped," which tells me

2    that cease fire means something to them.

3    So if someone had yelled out "cease fire," the shooting

4    would have stopped immediately.  And that conclusion is

5    supported in the *Jackson* case, which is cited as

6    327 F.2d -- third -- I mean, F.3d 52.  In that case, it was

7    a case in which officers were kicking and punching a suspect

8    on the ground.  There were officers watching who weren't

9    saying anything.

10    A new officer came immediately on the scene and said

11    stop.  Everybody stopped.  The court then said, "We can

12    presume that if the other two officers had said stop, then

13    everybody would have stopped then."  That's the same case

14    here.  The sheriff yells "cease fire," everybody stopped

15    shooting.

16    If Acy or Elward who were in the front had yelled

17    "cease fire" -- because you have to keep in mind, according

18    to what Jason is saying, all of the shooting was coming

19    right there in the center -- was coming from the center of

20    the house.  These guys were arm's length apart.  So if one

21    yells "cease fire," the person that's arm length from you

22    can hear you say cease fire, stop.

23    These guys were not -- the guys that he alleged were

24    doing the shooting, they were in a very close proximity.  We

25    can look at that car.  You've seen that car before.  And so

1    you've got -- according to the diagram, you've got four guys

2    that are -- one, two, three, four guys that are behind this

3    one car.

4        The car is not that big, so if one says "cease fire,"

5    then everybody can hear it.  As a matter of fact, when we

6    looked at the WLBT video, these guys were practically on top

7    of each other.  They were practically on top of each other.

8    So if one person who was standing there -- and Acy was

9    standing there, Elward is standing there -- if they had said

10   "cease fire," everybody right there would have heard it.

11   All of those shooters right there would have heard it.

12       So to answer your question, I do believe had cease fire

13   had been said immediately, because when he fell through that

14   door, Acy admits, "I knew the gun was gone.  I knew the gun

15   was gone."  And he never said a word.  He never said a word.

16   He never said "cease fire."  He never exercised his duty to

17   stop what was excessive force.

18       And then I think you had -- the question of how did you

19   know that he was shot -- how did they know that he was shot

20   when he fell?  Now, whether the officers would know that he

21   was shot, but they could clearly see he was incapacitated.

22   He wasn't moving.  One guy was literally on top of the hood

23   of the car.

24       And the interesting thing is opposing counsel argues

25   that they can't see through the car.  They can't do the --

1    if they can't see, why are the shots forwarded toward the

2    ground.  Based on his analysis, they should have still been

3    shooting straight up, because they didn't know or they

4    couldn't allegedly see what his position was.  No, they saw

5    him fall to the ground, and they continued to shoot and

6    shoot and shoot until their boss told them to stop.  That's

7    when they stopped, when their supervisor said stop.

8         So whether or not they knew he was shot, it was clear

9    that he was incapacitated.  He wasn't moving.  He fell

10   straight to the ground.

11        THE COURT:  So who are you saying shot him?

12        MS. GOLIDAY:  I'm saying according -- and the

13   interesting thing, Your Honor, when we look at what is

14   actually in the testimony given by the officers, Beemon, who

15   is Number Four on, and probably the furthest -- well,

16   Stickman, he and Stickman are the furthest away from the

17   front door -- Beemon says he shot at Woods, but he doesn't

18   mention how many times he shot.

19        Elward says that he only shot eight times, and he was

20   the closest person to the door.  Acy says, well, I only shot

21   the nonlethal round.  Whittington says -- and Whittington is

22   on the opposite end of Beemon, says, hey, I fired eight

23   shots.  Stickman, who is on the other side of Beemon, says I

24   don't know how many shots I fired.  White then, who is

25   further out, says that he fired five shots in his affidavit,

1    but in his statement, he doesn't say how many shots he

2    fired.  And then of course Barrentine, who is out close to

3    White, says that he fired one shot.

4        So all of this shooting is going on in this very short

5    period of time, but everything is in such close proximity

6    that the command of cease fire would have been heard by

7    everyone.  It would have been heard by everyone.  But the

8    two officers who knew that this man was no -- who knew

9    emphatically that this man was no longer a threat said

10   nothing.

11       THE COURT:  So then the ones who -- you're saying they

12   kept on shooting?

13       MS. GOLIDAY:  Correct.

14       THE COURT:  Well, now, but all the affidavits said was

15   that they shot one time, five times.  But does that say that

16   they pulled the trigger that many times while he was on the

17   ground?

18       MS. GOLIDAY:  No.  They don't say when -- what they --

19   the ones who do mention it use some generic language that I

20   continued to shoot until the threat was resolved.  But none

21   of them admit that they shot him while he was on the ground.

22       THE COURT:  So then are you saying that all the

23   officers out there are liable?

24       MS. GOLIDAY:  Your Honor, I'm saying emphatically that

25   those officers who were directly in front of the house, and

1    they could see that this man was on the ground, that they --

2    and they continued to shoot, that they are liable, because

3    they knew he was no longer a threat.  He came out of that

4    house, he fell straight to the ground.

5        The interesting thing when we talk about this weapon

6    and we go back through the statements, you have Acy who

7    says, "Hey, he threw the gun out when he came -- crossed the

8    threshold of the door."  Elward says, "He came across the

9    threshold of the door.  The gun hit me when he threw it."

10       Then you have Burleson who says as I walked -- this is

11   after all the shooting is done.  He says, "As I walked

12   toward the front door, I noticed the suspect was aiming the

13   gun at me laying on the ground."  So he then alleges that

14   Pierre Woods still got a gun in his hand.

15       So those are all jury questions.  Those are all

16   questions.  The position -- the position of that gun when he

17   crossed the threshold of that door, we've got three

18   different statements about what's going on.  These are

19   police statements about what's going on with this gun.  We

20   have witnesses, one in particular, Mr. Boyd, who when we

21   interviewed him -- interviewed with us, advised us that he

22   had the same line of sight as the guys who were on the hood

23   of the car, and that he could see Mr. Woods coming through

24   that door.

25       And so what we have here, Your Honor, is a man, keeping

```
 1      in mind -- and I'm going to -- I want to admit into evidence
 2      the tax assessor's records for this particular house, which
 3      shows that this house that Mr. Woods was in was about 900
 4      square feet.  So you have to keep in mind that they shot two
 5      canisters of tear gas in a house that's 900 square feet
 6      and --
 7           THE COURT:  But, now, what's wrong with that, though?
 8           MS. GOLIDAY:  Huh?
 9           THE COURT:  Now, what's wrong with that part?
10           MS. GOLIDAY:  And I'm -- what I'm saying is, you have
11      that much tear gas in a small confined space.  We know the
12      effect of tear gas.  The whole point of tear gas is to
13      disorient you.  The sheriff says, "That's why we put it in
14      there."
15           So when he's headed toward this door, his eyes are
16      burning.  His eyes are burning.  He's having difficulty
17      breathing.  He knows at that point, this is over.  This
18      is -- whatever fight I was putting up is over.
19           THE COURT:  So you came out because -- you're saying he
20      came out because of the tear gas?
21           MS. GOLIDAY:  Because of the tear gas.  Because his
22      coming out -- initially, I think if you look at even what
23      the officers said, just taking their -- they shot the tear
24      gas in the window.  He shot out of the window.  Then they
25      shot another canister of tear gas.
```

 1      After the tear gas, he starts moving toward the front

 2   of the house, because his skin -- I mean, the effects of

 3   tear gas, that's undisputed:  The eyes tear up, involuntary

 4   closing of the eyes, itching, burning, temporary blindness,

 5   blurred vision, coughing, difficulty breathing, all of that.

 6      And the sheriff tells us this is why they use it, is

 7   because they want to -- they wanted to force him out of this

 8   house, because they had realized that he wasn't coming out

 9   on his own.  So as he's approaching this door, he is

10   disoriented.  He's clearly disoriented.  They shot two

11   canisters of tear gas in a 900 square foot house.  And the

12   two canisters were shot in the room that he was in, which we

13   will presume was not 900 square feet, because the whole

14   house is 900 square feet.

15      So he's got all of this tear gas on him.  He -- that's

16   the point where the witnesses are saying that he's

17   disoriented.  He understood this fight is over.  And when he

18   came to that door, he was in a position of surrender.

19      THE COURT:  Okay.  Just -- you have two witnesses who

20   say he had his hands above his head.

21      MS. GOLIDAY:  I have two witnesses who said -- who were

22   emphatic that his hands were above his head.

23      THE COURT:  And where were they positioned?

24      MS. GOLIDAY:  They were positioned where they could see

25   the front door.

1          THE COURT:  Where was that?  Where were they at?

2          MS. GOLIDAY:  They have -- these -- the three people

3     that we're talking about, they were actually in their homes.

4     So they were not -- you know, if you watch the videos --

5     well, I've seen some other videos where they're pushing all

6     the people out.  But these people were in their homes, and

7     they could see that front door from their home was my

8     understanding of their testimony.

9          THE COURT:  So you're saying they were not outside?

10         MS. GOLIDAY:  No, no, no.  And I know for sure Mr. Boyd

11    was not outside.  He was in his home, and he could look out

12    of his window and look directly into that front door is my

13    understanding of his testimony.

14         THE COURT:  So then you don't place much credibility in

15    Tyson Burleson's testimony that when the decedent came

16    outside, he shot at them?

17         MS. GOLIDAY:  No, I do not.  I do not.  And that is

18    indeed a disputed issue of fact as to whether he actually

19    shot at them or not.  Because according to Mr. Boyd, the

20    Rankin County Sheriff actually started shooting Mr. Woods

21    before he crossed the threshold of the house is Mr. Boyd's

22    testimony.  And he said -- his exact words to me were, "That

23    is why he fell out of the house when he got to the

24    threshold."

25         THE COURT:  What about one of these statements that he

1    had shot at his family earlier?

2        MS. GOLIDAY:  Your Honor, and I think that's -- that's

3    undisputed that he did have mental illness.  The toxicology

4    report did show that he had meth in his system.  And it was

5    also the anniversary of his mother's death as I understand,

6    so there is no dispute that he was in a bad way when this

7    exchange started.  There's no dispute about that.

8        THE COURT:  Now, what about his mental state of mind at

9    the time?  Was he someone who was considered to be insane?

10        MS. GOLIDAY:  I -- from what I understand, and even his

11    father said it on the WLBT video, he did suffer from mental

12    illness.

13        THE COURT:  Well, is that the one who said they didn't

14    let him talk to him?

15        MS. GOLIDAY:  Yes, Your Honor.

16        THE COURT:  Okay.  But the police did, according to

17    their statement, let him talk to his two brothers and a

18    cousin.

19        MS. GOLIDAY:  Correct, Your Honor.

20        THE COURT:  Do you dispute that or --

21        MS. GOLIDAY:  No.  No, I don't dispute that, that

22    people tried to talk him out of the house.  I don't dispute

23    that.

24        THE COURT:  Two brothers and a cousin?

25        MS. GOLIDAY:  Who it was, I'm not sure exactly at this

1    moment.  But I've seen a longer Facebook Live where it was

2    very clear that they had allowed various people to try to

3    talk him out of the house, so that is an undisputed fact.

4        THE COURT:  Okay.  And then -- well, back to his being

5    outside the house, there's a statement from -- let me see

6    who wrote this -- it's Exhibit A.  Who is that?

7        MS. GOLIDAY:  Is that --

8        THE COURT:  Is that Burleson?

9        MS. GOLIDAY:  Is that the Grogan -- Grogan, Number 1?

10       THE COURT:  That was Burleson.  Burleson.

11       MS. GOLIDAY:  Okay.

12       THE COURT:  And what he said was that, "As I walked

13   towards the front door, I noticed the suspect that was

14   aiming his gun at me laying on the ground.  He was then

15   placed into handcuffs for our safety.  At that point, we

16   decided to clear the residence for anymore suspects.  As we

17   entered, I went towards the kitchen and could hear a

18   high-pitched noise that sounded like something leaking."

19       So what he's saying is that the suspect was on the

20   ground after the shooting and still aiming his gun at him?

21       MS. GOLIDAY:  That's what that officer is saying, Your

22   Honor.

23       THE COURT:  He said that he himself only fired his

24   department weapon three times?

25       MS. GOLIDAY:  Yes, Your Honor.

```
1         THE COURT:  Grogan says all his shots were aimed
2   towards the bedroom window?
3         MS. GOLIDAY:  Yes, Your Honor.
4         THE COURT:  And not towards the front door at all?
5         MS. GOLIDAY:  Correct, Your Honor.
6         THE COURT:  So he was at the front up there by the
7   vehicle, but he says he only shot one time.  "I then
8   observed a male standing at the bedroom window holding a
9   pistol."  He said, "I fired a 40 millimeter less lethal gas
10  round into the bedroom."
11        And then moments later, he shot another round of gas in
12  there.  "It was at this time the male fired a round towards
13  myself and other SRT members out of the bedroom window where
14  he was seen standing.  I then transferred to my pistol and
15  fired rounds to the suspect."
16        And then there is Chance White.  He's the one who said
17  he fired approximately five times in a rapid succession?
18        MS. GOLIDAY:  Correct, Your Honor.
19        THE COURT:  Almost immediately upon Pierre Woods
20  appearing from the front door of the house, and I stopped
21  shooting when Woods was no longer a threat.  So he said he
22  shot five times in rapid succession.
23        MS. GOLIDAY:  Yes, Your Honor.  That's in his
24  affidavit, but if you read his statement, he doesn't say how
25  many times he shot in his actual statement that he wrote on
```

1    the date of the incident.

2        THE COURT:  Okay.  Stickman, "I saw the suspect running

3    through the house towards our direction with a handgun in

4    his hand.  I then fired my rifle."  That's what Stickman

5    says.  He said that he had a clear view of the front door,

6    because it was open.

7        Rauch, R-A-U-C-H, says he shot approximately seven

8    rounds in the window, and then he heard more gunshots where

9    the other officers were positioned.  "I was made aware that

10   Woods had exited the residence pointing a firearm at SRT

11   members outside the front door."  But then he acknowledges

12   that, "I could not see the front door due to my position

13   behind the M-R-A-P."  But he was told that the decedent had

14   exited the residence pointing a firearm.  Again, I don't see

15   that on the tape.

16       Whittington, as I said, said that he saw the decedent

17   through the front door "as he ran towards myself and other

18   team members with a black handgun raised in our direction.

19   I then fired approximately eight rounds from my rifle at the

20   subject.  When the shooting subsided, the subject was lying

21   face down just outside the front door of the home."  As I

22   said, I didn't see that in the video.

23       All right.  Thank you.  Let me go back to Mr. Dare.

24       MS. GOLIDAY:  Okay.

25       THE COURT:  Mr. Dare, why does not the video present

```
 1    disputed issues of material fact on the shooting after he

 2    fell out of the house?

 3         MR. DARE:  So we get to --

 4         THE COURT:  What's your best argument on that?

 5         MR. DARE:  The shooting after the house --

 6         THE COURT:  The shooting after he fell out of the house

 7    and the officers continued to shoot, what's your best

 8    argument as to why that does not provide disputed issues of

 9    fact?

10         MR. DARE:  So, first, it is as Ms. Goliday has just

11    said, uncontested that the officers began firing before

12    Mr. Woods exited the house while he still had the gun.

13    There is no evidence before the Court that any of the shots

14    actually hit Mr. Woods -- any of the shots after he fell to

15    the ground actually hit Mr. Woods, and/or if they did hit

16    him, if they were fatal shots.

17         In other words, were they to the upper part of the

18    body?  There are shots noted on this pathology report to the

19    lower part of the body, whether any of those were to the

20    lower part of the body.  Because this is only a wrongful

21    death claim, this is not a survival action.  There has to be

22    evidence before this Court that those shots fired after he

23    had hit the ground caused his death, and there is not.  The

24    other issue, Your Honor, is --

25         THE COURT:  One second.  Are you going to need the
```

1     video for anything?  Otherwise, I can excuse Mr. Keithfer.

2         (An off-the-record discussion was held.)

3         MR. DARE:  And the question posed by Your Honor was

4     relating purely to the shots after he hit the ground.  I

5     would say that I do not read Barrentine's statement --

6     excuse me, not Barrentine -- Ty Burleson's statement, that's

7     at Docket 75-2 on Page 4, to read that once Investigator

8     Burleson came around the MRAP, the M-R-A-P vehicle, and saw

9     Mr. Woods on the ground, that he's saying that he still had

10    the gun on him.  I believe that he was identifying the

11    individual who was laying on the ground.

12        I don't think that that creates a triable issue of fact

13    in whether or not he had the gun on his person or didn't

14    have the gun on his person.  The Court can assume for this

15    motion that he didn't have the gun on his person, so then --

16        THE COURT:  Okay.  If he didn't have the gun on his

17    person lying on the ground, then what justified the officers

18    for continuing to shoot at him?

19        MR. DARE:  So he had dropped the gun --

20        THE COURT:  Thrown.

21        MR. DARE:  -- or thrown the gun that hit Hunter Elward

22    after he came out of the house, or as he was coming out of

23    the house.  The justification for the remaining four to five

24    seconds worth of shooting are that it is a continuation.

25    There is no break in any of the shots.  There are multiple

1    shots coming from different angles, and there is not a clear

2    line of sight to the individual, may have been able to see

3    his legs.

4        I submit to the Court that based on the angles of the

5    vehicle and where the officers were standing, there was not

6    a clear line of sight.  And so even if the Court said that

7    there may have been a Fourth Amendment issue to try, I still

8    don't think we get past qualified immunity, because there is

9    no clearly established law in this case.

10        And remember *Plumhoff*, the U.S. Supreme Court case that

11    everyone has cited.  In that case -- I'll give you the cite.

12        THE COURT:  Well, isn't it clearly established that you

13    can't shoot an unarmed man?

14        MR. DARE:  So it is not.  In fact, the case of

15    *Batyukova*, B-A-T-Y-U-K-O-V-A, *v. Doege*, D-O-E-G-E, that's

16    994 F.3d 717.  It's a Fifth Circuit case from 2021.  I

17    believe that in -- its line of cases that it cites were for

18    the position that, in fact, the individual did not have a

19    weapon.

20        THE COURT:  But now -- but didn't those cases say that

21    the police thought he had a weapon?

22        MR. DARE:  Correct.

23        THE COURT:  But in this case, who says they thought he

24    had a weapon that seems to be credible?

25        MR. DARE:  Everybody.  He shot at the law enforcement

1    officers.

2         THE COURT:  After he threw his gun away?

3         MR. DARE:  Only one individual, perhaps two, saw him

4    throw the gun.  And one of those was hit and turns away, as

5    shown by the WLBT video.  And the other one, there is no

6    knowledge of whether he's got another gun.

7         There -- he could have had another gun in his pants.

8    He could have, because the shooting was continued from

9    elsewhere.  There is no way to know is the individual in

10   front of me, that I can't clearly see all of him, is he

11   still shooting at me, or is somebody else shooting at me?

12        And that is the situation that happened in the *Garza v.*

13   *Briones* case.  It's the 2019 opinion from the Fifth Circuit,

14   943 F.3d 740.  An individual was sitting in a bar holding

15   some wine and a pistol, then said put the pistol down.  It

16   looked like he was going for it.  One of the officers fired

17   a shot.  All of the rest of the officers that were

18   surrounding the area thought that it was the person -- that

19   the suspect had fired the shot, and so they all started

20   shooting.

21        They shot 51 times, hitting the suspect 18 times, and

22   they shot for eight seconds.  And they could clearly see

23   him.  They were right in front of him.  And the Fifth

24   Circuit says that was not unreasonable, because everything

25   was in continuous, rapid succession and that the shots were

1    all fired until the threat was no longer present or that the

2    officers could reasonably perceive that there was no longer

3    a threat.

4        In the two cases that plaintiff has cited, both of

5    those are opposite, and the fact situation is not the same

6    here.  *Roque v. Harvel*, now, that's a 2021 case, and

7    remember, that one can't establish, clearly establish law

8    for this case, because this case was in 2019.  But, again,

9    say what was clearly established at that time.

10       But even that case I don't think is the same here.  In

11   *Roque*, the suspect had a BB gun.  It was a younger male, had

12   a BB gun.  He goes up, and there was a bunch of people out

13   in the yard.  Takes the BB gun, acts like he's about to

14   point it at his head, and they shoot him in the stomach.

15   The Fifth Circuit says the first shot was fine.  But there's

16   a video showing he dropped the gun, there's a stop in

17   shooting, he turns around, starts walking, stumbling away

18   back towards the street, second shot, miss.  As he's still

19   walking away, having dropped the gun, shoot him in the back

20   of the head.  The third shot, there was a triable issue on

21   whether or not the officer had violated clearly established

22   Fourth Amendment precedent.

23       In *Mason v. Lafayette City-Parish Consolidated*

24   *Government*, it's a 2015 case from the Fifth Circuit, 806

25   F.3d 268, and these are the only two cases that the

1      plaintiff cites besides *Tennessee v. Garner*, and I'm going

2      to get to that.  But so in *Mason*, the officers fire five

3      shots, then there's a stop, gun's over here.  Mr. Mason, or

4      the suspect, is lying on the ground in a prone position with

5      the officers over top of him, and then they shoot him at

6      that point in time once again in the back.  Clear line of

7      sight in that case.  Also in that case, there was medical --

8      there was expert testimony that that last shot was the fatal

9      shot.  And moreover, he couldn't have moved based on the

10     first shots that were fine according to the Fifth Circuit,

11     because he had been -- I think he had been hit in the spine

12     or maybe in the shoulder, and he wouldn't have been able to

13     reach for the gun.

14         And then *Tennessee v. Garner*, going way back, that one

15     the officers go to a disturbance call I believe it was.  One

16     of them hears somebody running out the back door.  The

17     individual was unarmed, was trying to get away from them and

18     climb a fence.  In that one, there was testimony from the

19     officers that they suspected or they pretty much knew that

20     he wasn't even armed, and they shot him in the back as he

21     was climbing the fence.  That one created a triable issue of

22     fact.

23         We don't have the knowing this individual was unarmed

24     through that entire continuous seven seconds.  And that's

25     why I think this one is much more like *Garza* where even

1  there you have a clear sight, and it's continuous until

2  there was no break in between shots.  And applying *Plumhoff*

3  saying it is not unreasonable to continue firing until that

4  you know the threat is no longer present.

5    So even if there -- even if the Court found that there

6  may be an issue for whether or not Mr. Woods' Fourth

7  Amendment rights were violated in this case, I don't believe

8  that there is any clearly established law at this juncture

9  that says what these officers did was clearly -- it was

10  clearly established that these officers acted in violation

11  of the Fourth Amendment, neither the bystander claims, nor

12  the actual shooting.

13    Now, does the Court want me to address the bystander

14  claims?

15    THE COURT:  No.  The bystander claim to me has some

16  problems with it, but I'm still concerned about the main

17  claim.  I'm still concerned about shooting an unarmed man at

18  the time and shooting him when the police have provided

19  their testimony, which is all over the place.  There is no

20  real consistent story among them, and I just see some

21  problems there.

22    But nevertheless, I am going to think about it, and

23  today is, what, Wednesday?  Wednesday.  So by Monday, I'm

24  going to have a short opinion out on this.

25    Now, in the meantime, however -- in the meantime, when

1      can you get her a response to her demand?

2          MR. DARE:  I will speak with my clients this afternoon

3      to determine if they are wanting to provide a response, and

4      if they do, I will get her one.  I absolutely will.

5          THE COURT:  Okay.  Yes, ma'am?

6          MS. GOLIDAY:  Your Honor, and I just wanted for the

7      record to -- if you would allow me to address the *Garza* case

8      that he spoke so adamantly about?

9          THE COURT:  What did you want to say about it?

10         MS. GOLIDAY:  In this particular case, it's easily

11     distinguishable, because in that case, the person who was

12     shot was saying that I never pointed my gun.  But there was

13     a video that showed the guy had pointed the gun.

14         And, yes, there were several shots made, but there this

15     court referenced the *Plumhoff* case and said if a case --

16     well, let me go back.  Particularly dealing with *Garza*, the

17     court notes defendants stopped firing when Garza fell to the

18     ground and was no longer a threat.  That they fired 61 shots

19     in eight seconds, standing alone, does not render their use

20     of force objectively unreasonable.

21         So here was the key difference between this case and

22     our case, is that they stopped when he fell.  Rankin County

23     Sheriff's Department didn't stop when Pierre Woods fell.  So

24     this case doesn't apply, and it doesn't stand for the

25     proposition that opposing counsel is suggesting, and that

 1    the case -- two cases that we cite in our pleadings are more

 2    analogous to the facts that are in this case.

 3        THE COURT:  All right.  Now, let's go back to the

 4    settlement.  On the settlement matter, you made a demand?

 5        MS. GOLIDAY:  Yes, Your Honor.

 6        THE COURT:  Okay.  And you have settlement authority I

 7    take it?

 8        MS. GOLIDAY:  Yes, Your Honor.

 9        THE COURT:  Okay.  So when can you get her an answer?

10        MR. DARE:  I will try to do that by this afternoon or

11    tomorrow.

12        THE COURT:  Okay.  And can you notify the Court when

13    you've notified her?

14        MR. DARE:  I can.  As I said at the beginning, it's

15    with this matter it is -- well, I won't get into any of the

16    arguments.  Yes, Your Honor, I will notify the Court once I

17    have responded to the demand.  Would the Court like to know

18    my response when I give it?

19        THE COURT:  No, I don't have to have it; just that you

20    have given one.

21        MR. DARE:  Understood.

22        THE COURT:  And then what I might do is set up a

23    telephone conference with you all, so I can see then what --

24    how plaintiff responds to it, whether plaintiff accepts it

25    or has a counteroffer or counterdemand.

1          MS. GOLIDAY:  Yes, Your Honor.

2          THE COURT:  Okay?

3          MS. GOLIDAY:  Also, I wanted to put the autopsy report

4     into evidence.

5          THE COURT:  Okay.  Any objection on that?

6          MR. DARE:  Well, I haven't even looked at it.

7          THE COURT:  Okay.  Well, look at it.  And I'll talk to

8     you on the telephone when you call and tell me you've given

9     her your response.  Okay?

10          But go ahead and look at it.  I haven't had a chance to

11     read it either, because I have some questions about it.  But

12     I haven't had a chance to read it.  I am going to read it,

13     too.

14          All right.  Then as soon as I hear from you, I'll get

15     you on the line, so that we can see where we're going.

16     Okay?

17          MS. GOLIDAY:  Okay.  Thank you, Your Honor.

18               (Court adjourned at 11:29 a.m.)

19     ****************************************************************

20

21

22

23

24

25

1            **COURT REPORTER'S CERTIFICATE**

2

3        I, Caroline Morgan, Official Court Reporter for the

4   United States District Court for the Southern District of

5   Mississippi, do hereby certify that the above and foregoing

6   pages contain a full, true, and correct transcript of the

7   proceedings had in the forenamed case at the time and place

8   indicated, which proceedings were stenographically reported by

9   me to the best of my skill and ability.

10       I further certify that the transcript fees and format

11  comply with those prescribed by the Court and Judicial

12  Conference of the United States.

13       THIS, the 8th day of May, 2023.

14

15                   /s/ Caroline Morgan, CCR

16                   Caroline Morgan CCR #1957
                     Official Court Reporter
17                   United States District Court
                     Caroline_Morgan@mssd.uscourts.gov
18

19

20

21

22

23

24

25